Good morning, your honors. I'd like to reserve about three minutes for rebuttal. As your honors know, this is a 28 U.S.C. section 455 disqualification case. It has a lengthy history. The lengthy history involves primarily the ex-party communications of prominent members of the Montana bankruptcy bar with the Montana bankruptcy judge. Isn't it pretty routine in any, well, not just in bankruptcy courts, but in our court if somebody is going to file a preliminary motion for a temporary restraining order, we ask them to give us some, you know, a heads up. Your honor, there are parts of the bankruptcy proceedings that are routine and could be described to be administrative. But for a law clerk to be giving her home phone number and cell number to the most prominent member and the best friend of the Montana bankruptcy judge before the petition is even filed is not routine, your honor. And in addition to that, for the judge I'm sorry, what's wrong with it? If it deals with matters of business, isn't that just being accommodating to, helpful to counsel? I don't get it. I don't understand any of this. If the judge gets the year, particularly in the totality of the circumstances I ask you a question. Yes, and the answer is, your honor, if The point is that the law clerk gives a point of contact and being helpful, says I'm going to be working from home, so here is where you can reach me at home, rather than letting counsel wait. I think most counsel in most jurisdictions would be grateful and find that accommodating and would consider it to be a service and nothing in the least bit objectionable. I can't imagine how you can suggest otherwise. That's the very first email, your honor. If you look at the totality of the circumstances flowing from that email Stop. Let's talk about that email. What's wrong with it? What is wrong with it is that in the sequence of events What's wrong with it? We can take the sequence up next. I would like to know what's wrong with that one. You listed it. It reflects an appearance of impartiality. Why? Because the law clerk who has direct access to the judge is telling this member of the bar that she is going to give the judge to give him direct access to the judge through her home and cell phone numbers. If you had called up on behalf of your client and said I need to reach you over the weekend, I may have an emergency, you wouldn't have gotten the same thing? If it was strictly limited to those circumstances, your honor, I would agree with you. But in the totality of this case, that is not what happened. The first email is simply an indication of what was to come. I must tell you, I have looked at all of these things, the entire record, and what it looks like to me is that your client just doesn't like the outcome and has picked through and found a variety of items, none of which is in the least bit objectionable, and in a desperate effort to try to get rid of the judge because he is unhappy with the judgment. This is, in my view, borderline misconduct on your part to even raise these things. It is highly questionable. Your honor. I share Judge Kuczynski's concerns. What was the basis for essentially accusing Judge Kirscher of running a kangaroo court? Your honor, I was there. I've been litigating in American courtrooms for 43 years, all over the United States. This is the first time in that 43-year history I have ever experienced what I experienced in the Montana Bankruptcy Court. When I looked at all of the orders and writings of the judge in this case, objectively, I mean, I wasn't there. I was just reading what's on the paper. It looks like he did a very sort of careful analysis of all the issues that were raised, and it came out against your client. And the consequences of those decisions were quite significant. And as Judge Kuczynski pointed out at the outset here, it looks to me like this is the one way, possible way, if he were to succeed, and I'm not even sure that it would result in the relief that you're seeking, a way of overturning the judge's decisions. Your honor. You can challenge Judge Kirscher's decisions upon appeal, and I think one of them is still on appeal. True, and it appears that the preferred method of dealing with these kinds of things, knowing that there's a judicial conduct complaint issue at issue here, and knowing that there's a reappointment committee at issue here. But in this case. That has nothing to do with what we're talking about here, with the issues you raised here in this motion for disqualification. It does raise a 28 U.S.C. We're dealing with your claim that Judge Kirschner abused his discretion in not granting your motion to recuse himself. Correct, your honor. And the reason I bring up the two committee issues is because of the evolution of the facts that have been found over the years that have been presented to those two committees. Found by whom? When you say found, do you have some findings from somebody? The facts that we have uncovered, your honor, and there are more facts that have been recently uncovered that I submit to the court. The court will find when they're submitted this week to those two committees are simply shocking. We're dealing with communications that have never been. You are now raising matters outside the record, and I'm going to remind you of what Judge Pryor has just told you. We are dealing with this appeal in this case on this record. If you wish to supplement the record, there are motions for that, and you can file motions and opponents can then turn on opposition, but you can't just raise them and drop them into an argument. That is improper. That is itself a questionable propriety, and you should not, after 43 years as a lawyer in courts all over the country, be trying stuff like that. Now, let's get back to this case and this record. You've raised a number of facts that you claim amount to misconduct, and it just isn't a hell of beans here. There's nothing at all. There's a careful judge making careful decisions, thorough decisions in a difficult and fraught case, and as best I can tell, you managed to find nothing that's just misconduct. What is your worst thing here? The best one, Your Honor, is Judge Kershaw, after the trial, attending settlement negotiations with my client's adversaries, concealing his involvement in those settlement negotiations, and then at the same time The settlement was not a settlement of this, though, of this adversary proceeding. It had to do with the basic plan, right? No, Your Honor. It was an auction, right? No, Your Honor. What happened is there was an auction, but the only way the plan could get approved was for the AP14 case to be resolved. That is why Judge Kershaw issued what he called an interim order. The only way that it could get approved under the settlement term sheet, which Judge Kershaw's ex-party attended and negotiated with my client's adversaries, was to have Mr. Blickstaff targeted as the only target in the plan with the settlement negotiations. First of all, in the end, what Judge Kershaw did was to give $40 million instead of $250 million or something. So it did not, in fact, fund the plan. Well, Your Honor, it has not yet funded the plan because the idea that Mr. Blickstaff looted the company and is responsible for $40 million is itself a myth. It is simply a fact. I understand that. But in fact, if Judge Kirshner were trying to do what he said he was trying to do, apparently what he actually did was to decide largely against the creditors in this adversary proceeding. No, Your Honor. He basically negotiated a deal with my client's two adversaries where he exculpated them from being sued by my client while targeting my client. I'm not responding to what I said. How much money is needed to fund the plan? Approximate, well, it depends how you look at it, but from one perspective, it's probably in the range of anywhere from, depending on the classes, from $30 to $40 million. I thought they were asking for something like $250 million. The claim is for $280 million. Not $40. That the ultimate claim was for $280 million, Your Honor. Not $40. They're not happy. But Your Honor's question went to actually fund the plan, what was necessary. I thought it was in the order of $200-something million. No, Your Honor. It's in the order of $40 million. If I were answering your question as to which was the most problematical thing, it would be Mr. Hilo or whatever his name was, the other law clerk. Terry Hilo. Right. But in that instance, he didn't seem to be operating at the direction of Judge Kirshner. Well, the conduct is imputed to the judge. The issue of whether or not we have to prove actual knowledge of what took place between the two of them is not at issue under Section 455, Your Honor. I thought the judge made findings that it didn't happen. I beg your pardon, Your Honor. I thought the judge found, made findings that it did not happen, that what was imputed to the law clerk did not in fact happen. No, Your Honor. He did not make that finding. He made the finding that he didn't know that it happened. But he did not make the finding. And that he wasn't working for him with regard to that issue. That's correct, Your Honor. The second most significant thing is that the just before this trial, which took place in less than 30 days on a $280 million claim against my client, in complete contravention of due process, the federal rules of civil procedure. Why are you saying that? If you have a problem with the timing of the trial, you take an appeal from that case. Why are you raising that in this proceeding? Because, Your Honor, under 455, the totality of the circumstances, including the ex parte communications which I've recited, which go to the heart of the issue, are also encompassed within an appearance of bias standard under Section 455. But the second most important thing is that Mr. Patton received an e-mail, which this court has, just prior to the commencement of the trial, in which the senior judge, this is just nine days before the commencement of the trial, the senior bankruptcy judge writes to Mr. Patton and says the following, Andy, Judge Kershaw has the UCCD credit suites, that's AP 14, and Blix has scheduled to start in Missoula on Wednesday, 4-22-09. The staff here has to travel, and your fax to me indicates at 9. All litigation will be stayed and dismissed with prejudice upon the effective date of the plan with Blix's cause to be dismissed without prejudice. That's prior to the trial ever even starting, where the senior judge is telling my client's primary adversary. First of all, have you taken an appeal from the underlying? We've appealed from everything, Your Honor. Okay. We have filed emergency motions. We've filed motions for reassignment. How does this, either the Hilo issue or this issue, go to disqualifying Judge Kershaw? They reflect an appearance of bias. On this part? Yes, Your Honor. They reflect an underlying communication link, ex parte, outside due process, that is not on the record, that's concealed from my client. But that could be with regard to Judge Patton, but why with regard to Judge Kershaw? Because Mr. Patton has demonstrably had ex parte prior communications with Judge Kershaw, at least through the law clerk. I'm sorry. So there's a continuing pattern of ex parte communications from prior to the petition being filed throughout these proceedings, and then just before the trial begins, the senior bankruptcy judge writes to Mr. Patton and says not only what I just read into the record, he says that also as to that case you may want to see Schubert's case. He's now advocating against my client with Mr. Patton. And what does that have to do with Judge Kershaw? Judge Kershaw shares chambers with the senior bankruptcy judge. They're both communicating, either through the law clerk. They share chambers? They're both judges in the Montana Bankruptcy Court. They don't share chambers. Well, they share the same courthouses, Your Honor. And now you have the senior bankruptcy judge. I'm sorry. So? Advocating and giving case citations against my client before the trial even begins. Because that judge showed up in your case, you might have a problem, but he isn't. Well, Your Honor, if the conduct of law clerks under the law, particularly the Hall case which is cited in that brief, is imputed for the judge, under all of the circumstances of this case, for a colleague of Judge Kershaw, to be telling Mr. Patton what the outcome is going to be before the trial starts and to be giving him case citations to be used against Mr. Blixstaff is plainly objectionable. It plainly indicates impartiality toward my client. The sequence of events that took place that led to this $40 million judgment plainly shows that Judge Kershaw was, at the very least, presenting an appearance of impartiality as to the outcome of this case. For one judge to be telling Mr. Patton what the outcome is going to be before the case starts. But where did he tell him what the outcome was going to be? He says to him, upon the effective date of the plan, the Blixstaff cause will be dismissed without prejudice. That is why we intervened. It was plain from everything that was occurring in this case that Mr. Blixstaff was going to be named the target. In both the disclosure statements and in the original complaints that were filed, it was plain that the entire plan, as it ultimately did, was designed to target Mr. Blixstaff. And it was plain that the entire concept of doing that came out of the California divorce and the marital settlement agreement when Ms. Blixstaff went to Mr. Patton and retained Mr. Patton to represent him, who then immediately emailed Judge Kershaw's law firm and said, we're going to be filing a case. And she gives them their home and cell phone numbers. And then the entire outcome of the case from that point forward, with all of these ex-party communications, with the type of thing I just read into the record, leads to the exact result that Judge Kershaw wanted when he went and negotiated ex-party, without my client's presence, a plan that targeted my client. In the overall scope of the case. Your Honor's time. Thank you, Your Honor. By the way, I didn't see your name on the brief. Were you involved in writing the brief? Yes, Your Honor. Why isn't your name on the brief? It was an oversight. Both times? Yes, Your Honor. It was an oversight. When you asked whether I was involved in writing it, I consulted with Mr. Conant and Mr. Ferrigno in the writing of the brief. Did I directly participate in any writing of the brief? No, I did not. Did they call me on occasion and ask me what happened during the trial? Yes, they did.  I tried the case below, Your Honor, but I did not write the brief. I was consulted by Mr. Conant and Mr. Ferrigno as to various events and record citations when they were writing the brief. But you take responsibility for what's in the brief? I do. You do? I do, Your Honor. Thank you. May it please the Court. I'm Mr. Powell. The several points are important here. One, Judge Peterson, who communicated with me, was the mediator. We had just finished a mediation. Every mediation I've ever been at, there's ex parte communications with the mediator. That's the way they work. That was Judge Peterson's role in this case. He was the mediator. Of what? Of the claim against Credit Suisse and Mr. Blixa and resolution of the Chapter 11 bankruptcy plan. Not this adversary proceeding? Yes, it did involve this adversary proceeding, Your Honor. Immediately before the trial, the first trial was scheduled in this adversary proceeding, we had a mediation in Butte. Judge Peterson was the mediator. The debtor, the unsecured creditors committee, Cross Harbor, the dip lender, and a prospective buyer of the Yellowstone Club, Credit Suisse, and Mr. Blixa all attended the mediation. It lasted all day. Was Mr. Blixa there? Yes, he was there. And who was his counselor then? Mr. Flynn was there with Mr. Blixa. That was on a Friday. The following week was when we started the trial in the adversary proceeding. And the trial in the adversary proceeding had to be done and completed before the confirmation hearing, and the confirmation hearing had to be done before the Yellowstone Club ran out of money and the lights went dark. That's why there was such a compressed schedule in this case. From the beginning of the adversary proceeding until the end was because there was no more money to keep operations going. And so everything was tied to a confirmation hearing and getting certain decisions completed and made before we got to that confirmation hearing. So we called on Judge Peterson, who oftentimes mediates in bankruptcy cases, to mediate this big dispute. And the communication that he sent to me was to follow up to see if the case had actually settled, because after the mediation in the courtroom with Judge Peterson, we all retired to a hotel and continued into the evening the settlement discussions. So it's important, I think, to remember what Judge Peterson's role in the case was. Judge Peterson also was the mediator in a case involving the Yellowstone Club world, which had asserted claims against Mr. Blixa, and Mr. Haleau was following up, and Judge Kershaw addresses this in his memorandum of decision, that appears that Mr. Haleau's comments were following up the mediation in the Yellowstone Club world versus Mr. Blixa's case. So he was officially employed by Mr. Kirshner, but he was essentially operating on behalf of Judge Kirshner, but he was operating on behalf of the other judge at that point. I think that's correct, Your Honor, but there's two law clerks in Montana for Judge Kirshner. Judge Peterson is on a senior status, and I'm not sure the exact nature of it, but he takes conflict cases from Judge Kirshner, and he does a lot of mediation, and I think he travels around the country doing mediations. And so to have Judge Peterson as a mediator is common. The way that the clerk's office, or the way the clerks are assigned the cases is based on the venue of the case. What about the question I was asking before about whether, you represented in your briefs, as I recall, that the $40 million judgment was a lot less than was needed to actually fund the plan. Is that right or not? That's absolutely correct. Well, the plan does not require any money from Mr. Blixit to be successful. The plan had two parts. One, sell the unit, sell the club as an ongoing enterprise, and keep its lights on and keep it operating. That was accomplished. The other part was for the general unsecured creditors that were not priority, then they would get paid out of whatever money the liquidating trustee could collect from all of the claims that the liquidating trustee might have, which included claims against Mr. Blixit. And also against Credit Suisse, but those were settled. That's correct, Your Honor. The Credit Suisse claims got subordinated except for its secured claim. The argument that Mr. Blixit makes that Judge Kershaw mediated a settlement that resulted in Mr. Blixit being the sole litigation target under the plan, and that the plan was dependent on it, is simply not true. The auction took place over three days. We were constantly in court having hearings during that three days, because we were arguing about virtually everything we could argue about. Credit Suisse was entitled to make credit bids, and it had to make cash bids, and we were trying to get all of the terms of the auction fixed. And we couldn't do it by agreement, so we were repeatedly going back into court and asking Judge Kershaw to resolve it. Finally, on the Friday. Was Blixit at any of those? No, because he was not a bidder. Mr. Blixit said he was going to bid, submit a bid, but he never did. He had no role in it. And I think Judge Kaczynski asked about the auction process, and that's what the settlement was about. It was about the auction process. The auction was the auction of the club. The auction of the club. And the plan was we would have an auction. We would take the results of that auction, go to the confirmation hearing, and as part of the confirmation of the plan, confirm the auction results. And then when the closing occurred, where the acquirer at the auction bought the club and its assets, then the liquidating trust was created, and all of these claims, and at that point there was more claims than the claims just against Mr. Blixit, were turned over to the liquidating trustee, and then the liquidating trustee would go liquidate it and get the money, and whatever money the liquidating trustee gets, he pays to the unsecured creditors. If they get nothing, the plan is still successful. If they get paid in full, then the plan, I guess, is a little more successful. But to say that the plan's success is dependent on recovering anything, Mr. Blixit, is simply not correct. The liquidating trustee was a component of the very first plan that was filed, which was filed sometime in February of 2009. By the time we got to the final confirmation hearing, we had, I think, four iterations of that, so we were on the third amended plan. The notion of a liquidating trustee didn't come up at this settlement discussion that occurred between Judge Kirscher and the principals of Credit Suisse and of Cross Harbor, who were the only qualified bidders. Instead, the notion of a liquidating trustee had been in the plan throughout. Mr. Blixit made himself a target when he voluntarily intervened in the adversary proceeding and put himself in front of the court, resulting in the debtors and the unsecured creditors committee having to file a compulsory counterclaim against him, which ultimately resulted in this judgment. Judge Bergeron, you made a comment about the $40 million judgment out of $286 million. $286 million was the total of the unsecured claims. Is that what it was? No. $40 million is the total of the claims if we exclude Credit Suisse. And $286 million is the total amount of cash and property that Mr. Blixit took from the Yellowstone Club, leaving it insolvent and being, as Judge Kirscher found, the primary cause of its bankruptcy. The liquidating trustee had demanded and requested the judgment be entered against Mr. Blixit for the $286 million, because that's what he took and the judge found that's what he took. The judge, though, accepted Mr. Flynn's argument, excuse me, Mr. Blixit's argument, that because Credit Suisse was a bad actor along with Mr. Blixit, all of the money that would go to Credit Suisse, he shouldn't have to pay that. And so that's the amount between the $40 million that the judgment is for and the $286 million that the liquidating trustee was asking for. That money would have all gone to Credit Suisse. The judge found that that wouldn't be appropriate, and so he limited the judgment to $40 million. If viewed, $286 million on one hand and $40 million on the other hand, I'd say that Mr. Blixit scored a major victory in getting a judgment of only $40 million. And that should be considered by a knowledgeable, rational, objective person looking at whether there's bias in the case. The judge ruled for Mr. Blixit in a number of substantial ways, and that's one of them, but the record has other ones of them. When Mr. Blixit intervened, the trial schedule was set. At the hearing on the intervention, the judge specifically told Mr. Blixit's attorney, we have a trial date, it's immovable, you have to be prepared, and it was coming up very rapidly. Mr. Blixit's attorney acknowledged that. Did he ask for a continuance at that moment? No, he waited until the next day, Your Honor, but he nearly immediately started asking for a continuance of the trial, which couldn't be granted because there was not enough money to keep the club operating beyond a certain date. So the trial was supposed to start, I think it was on April 22nd. The judge granted Mr. Blixit's request to extend it one week. Then there was a trial that I think it took six days. The judge came out with his decision that was interim, and it was only relative to the credit Swiss, the subordination of the credit Swiss claim. Then we had the option immediately after that, and we were still trying to sort out the judge's interim order. That interim order did not relate in any way, shape, or form to Mr. Blixit. There were no findings that were made against Mr. Blixit in that order? No. And then after the plan was confirmed sometime in June of 2009, then another order came out that granted Mr. Blixit additional time, which turned out to be nine months, to engage in the additional discussion that he had been complaining about throughout the process that he didn't have time to do. Gave him time to do the discovery, and there was another trial. The phase two of it was in February of 2010. There was another three or four days of trial then, and then ultimately in August of 2010 Judge Kershaw came out with a 135-page decision outlining the basis for the judgment and issued a judgment that described the amounts as amounts necessary to satisfy certain claims of creditors in the bankruptcy, but it didn't have a dollar amount. The liquidating trustee asked the courts to amend it to specify the dollar amount and then also to get it back up to the $286 million figure. Judge Kershaw denied that part of the liquidating trustee's motion to amend, kept it at the $40 million, and simply took from an affidavit that's talked about in the briefs what the dollar amounts for each of the classes of claims were and just totaled it up. It was just a simple mathematic exercise. And that's the $40? And that came up with the $40 million. Now what's the status of that judgment today? It's on appeal with the U.S. District Court in Billings. On both sides, basically. I believe that's correct, that it is both sides of appeal now. Anything further? In conclusion, I think a knowledgeable, objective person that knows all of the facts, reasonably looking at everything, would realize that Mr. Blickus has won some battles and major battles and that that really belies any claim of bias on the part of Judge Kershaw. But that's not the way you look at appearance of bias claims. The outcome is sort of irrelevant. No, Your Honor. But if the argument is that the judge only rules in one way because of all of this bias, that simply isn't the case. The judges rule both ways in this case. And for those reasons, I would request that Judge Kershaw's decision be affirmed. Thank you. Your Honor, that's time. I may have 30 seconds, Your Honor. You may have 30 seconds. Thank you, Your Honor. The underpinning of Mr. Batten's argument to the court regarding the involvement of Judge Peterson is completely misrepresented to the court. The e-mail that question is dated April 20, 2009, nine days before the trial started. Judge Peterson did not come on the scene until a year later. He had no open involvement with the case whatsoever that we had any knowledge of. The mediation that Mr. Batten is referring to took place in March and April of 2010. It is a complete fabrication and misrepresentation to the court to suggest that in April 2009, Judge Peterson was involved in a mediation in this case. Thank you, Your Honor. If the court gives me leave, I will file the notice of mediation as part of the record in this case. You may. Thank you. Case is argued. We'll stand some minutes.
judges: Kozinski, Paez, Berzon